**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UVALDO VALENCIA, et al.            )<br>                                                         )<br>            Plaintiffs,                          )<br>                                                         )<br>      v.                                              )<br>                                                         )<br>UNITED STATES OF AMERICA,     )<br>                                                         )<br>            Defendant.                        )<br>_____)  | CV F 05-0472 AWI GSA<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION<br><br>[Doc. # 78] |

      This is a wrongful death and survival action pursuant to the Federal Tort Claims Act, 28 U.S.C. section 1346(b), by the survivors of decedent Gracia Valencia de Viveros (collectively, "Plaintiffs") against proper party defendant United States of America ("Defendant"). The action arises out of alleged negligent acts or omissions by individual medical care providers employed by Family Healthcare Network (hereinafter, the "clinic" or "FHCN"), a federally funded medical and dental clinic doing business in Tulare County under the general direction of the United States Department of Health and Human Services. The alleged negligent acts or omissions occurred on or about April 10, 2003, during a dental procedure at the clinic during which Gracia Valencia de Viveros (hereinafter "Decedent") experienced respiratory failure. Decedent died about two months later as a result of complications arising from the respiratory failure.

      In the present motion, Defendant seeks summary judgment on all claims; or, in the alternative, summary adjudication for claims against Defendant arising out of the actions of

an individual healthcare provider, Dr. Sanchez.  Federal subject matter jurisdiction exists pursuant to 28 U.S.C. section 1331.  Venue is proper in this court.

## PROCEDURAL HISTORY

The complaint in this action was filed on April 11, 2005.  On January 13, 2006, defendants Family Healthcare Network and United States Department of Health and Human Services, as well as all individual named defendants were dismissed and the United States was substituted as the proper party defendant.  On December 14, 2007, Defendant filed the instant Motion for Summary Judgment or, in the alternative Summary Adjudication, and Motion to Exclude Expert Testimony (hereinafter the "motion for summary judgment").  Plaintiffs filed their opposition on January 15, 2008, and Defendant's reply was filed on January 18, 2008.  On January 24, 2008, the hearing on the motion for summary judgment that was scheduled for January 28, 2008, was vacated and the motion was taken under submission as of January 28, 2008.

## FACTUAL BACKGROUND

Except as specifically noted, the following facts are not disputed except as to hearsay and foundation.  Those objections are overruled as to the background facts that follow.

On April 10, 2003, Decedent visited Family Healthcare Network, a provider of medical and dental services that serves primarily uninsured persons in Porterville, California.  Decedent's visit was the first of three scheduled for dental procedures.  Decedent was seen by Dr. Agard, a dentist employed by the clinic.  Dr. Agard was aware that Decedent had reported that she suffered in the past from asthma and took albuterol via inhaler to relieve asthma attacks.  During the visit on April 10, Decedent received a local anesthetic, lidocaine, preparatory to the dental procedure.  Decedent had received lidocaine on previous occasions and had no known allergy to lidocaine.  During the procedure, a small amount of additional lidocaine was administered.  At some time during the procedure, Decedent signaled to Dr. Agard that she was having trouble breathing.  Decedent was asked to find her albuterol

inhaler. She got up from the dental chair without apparent difficulty and looked for her inhaler in her purse. Decedent was unable to find her inhaler. Dr. Agard then instructed that a "Code Blue" be called.

After the "Code Blue" was called, a physician, Dr. Antonio Sanchez, and a nurse, Nancy Banuelos, arrived along with a "crash cart" that contained, among other things, albuterol, oxygen and epinephrine. Dr. Sanchez ordered, and Decedent received oxygen through a nasal cannula. Although there is some dispute as to whether Decedent also received albuterol prior to the arrival of the ambulance, there appears to be uncontradicted evidence that Decedent received albuterol through a nebulizer and venturi mask before she was transported to the hospital. Dr. Sanchez directed that 911 be called and that Decedent be transported to the hospital by ambulance. Dr. Sanchez worked to stabilize Decedent's condition until the ambulance arrived. By the time the ambulance and the EMT team arrived, Decedent was experiencing labored breathing. After treating Decedent at the scene for about eight minutes, Decedent was moved to the ambulance for transportation to Sierra View District Hospital.

Decedent suffered respiratory failure in route to the hospital. Decedent became "obtunded," that is, unresponsive, following the respiratory failure and remained unresponsive until her death approximately two months later.

Undisputed material facts proffered by Defendant in support of the motion for summary judgment seek to support Defendants' three main contentions – that California's "Good Samaritan" law immunizes Dr. Sanchez from liability, that expert testimony offered by Plaintiffs' expert witnesses is inadmissible because it was submitted in violation of Rule 26(a)(2) of the Federal Rules of Civil Procedure, and because the expert witness testimony, even if admissible is not sufficient to establish causation. To the extent the proffered facts are material to the resolution of the issues presented, the facts will be discussed and disputes as to the facts resolved in conjunction with the discussion.

**LEGAL STANDARD**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Poller v. Columbia Broadcast System, 368 U.S. 464, 467 (1962); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985); Loehr v. Ventura County Community College Dist., 743 F.2d 1310, 1313 (9th Cir. 1984).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party has the burden of proof at trial, that party must carry its initial burden at summary judgment by presenting evidence affirmatively showing, for all essential elements of its case, that no reasonable jury could find for the non-moving party.  United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir.1991) (en banc); Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986); see also E.E.O.C. v. Union Independiente De La Autoridad De Acueductos Y Alcantarillados De Puerto Rico, 279 F.3d 49, 55 (1st Cir. 2002) (stating that if "party moving for summary judgment bears the burden of proof on an issue, he cannot prevail unless the evidence that he provides on that issue is conclusive.")

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or

admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 477 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); Poller, 368 U.S. at 468; SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)(per curiam); Abramson v. University of Hawaii, 594 F.2d 202, 208 (9th Cir. 1979). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the

5

inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

## DISCUSSION

### I. Applicable Law

The instant action is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. section 2674 (hereinafter, the "FTCA"). In an action against the United States pursuant to the FTCA, the district court applies the substantive law of the state where the negligent act or omission allegedly occurred. See Richards v. United States,369 U.A. 1, 11, 82 S.Ct. 585 (1962). The extent of the government's liability under the FTCA "is a matter of federal law (28 U.S.C. §§ 1346(b), 2674), albeit determined according to state standards." Taylor v. United States, 821 F.2d 1428, 1433 (9th Cir. 1987). However, while state law governs Plaintiff's substantive claims, federal law governs the procedural aspects of the case. See Schwarder v. United States, 974 F.2d 1118, 1126-1127 (9th Cir. 1992).

The parties agree that the acts or omissions alleged in this case occurred in California, and that substantive California law therefore applies.

### II. Liability of Dr. Sanchez

Defendant contends that it is not liable for any negligence by Dr. Sanchez because the "Good Samaritan Statute" California Business and Professions Code, section 2395 immunizes Dr. Sanchez from liability arising from his voluntary efforts to aid Decedent. Section 2395 provides, in pertinent part:

> No licensee, who in good faith renders emergency care at the scene of an emergency, shall be liable for any civil damages as a result of any acts or omissions by such person in rendering emergency care.

"An emergency within the meaning of the Good Samaritan statutes exists when there is an urgen medical circumstance of so pressing a character that some kind of action must be taken." Breazeal v. Henry Mayo Newhall Mem'l Hosp., 234 Cal.App.3d 1329, 1338 (2nd Dist. 1991). Good Samaritan statutes serve the policy purpose of encouraging "'physicians to

render emergency medical care when they otherwise might not."' McKenna v. Cedars of Lebanon Hosp., 93 Cal.App.3d 282, 288 (2nd Dist. 1979). "A physician who renders emergency aid in a hospital is afforded the immunity of the 'Good Samaritan' statutes 'unless a specific factual situation [. . .] is not within the ambit of the legislative intent [. . .] of encouraging emergency medical care by doctors who have no legal duty to treat a patient.' [Citation.]" Bryant v. Bakshandeh, 226 Cal.App.3d 1241, 1246 (2nd Dist. 1991) (quoting McKenna, 93 Cal.App.3d at 286-287). "The heart of the application of the Good Samaritan statutes is the inquiry whether a duty of professional care pre-existed the emergency." Burciaga v. St. John's Hosp., 187 Cal.App.3d 710, 716 (2nd Dist. 1986).

It is undisputed that Decedent's condition constituted an emergency for purposes of the Good Samaritan statute in question. As in the cases cited above, the parties appear to agree that the issue of whether Dr. Sanchez is entitled to Good Samaritan immunity turns on whether he had a pre-existing duty of care to Decedent.

Defendant alleges Dr. Sanchez had no pre-existing duty of care to Decedent and offers the Declaration of Dr. Sanchez in support. In pertinent part, Dr. Sanchez's Declaration states:

> On or about April 10, 2003, I was working at the Family Healthcare Network ("FHCN") clinic in Porterville, California as a medical doctor. My practice was family and general internal medicine. I primarily treated indigent patients on a variety of ailments. My expertise is not emergency medicine and providing emergency treatment is not part of the scope of my work at FHCN. I am not on a particular medical emergency panel or team, nor am I specifically "on call" to respond to an emergency. [. . . .] [¶] At approximately 3:10 p.m. on April 10, 2003, I heard a "Code Blue" page for assistance to the dental clinic, which was located on the second floor of the FHCN building. [¶] I responded to the "Code Blue" and arrived at the dental clinic within approximately 15 seconds to one minute of hearing the page. I responded because I believed I might be of some assistance. [¶] Upon my arrival, I witnessed a woman, who I later learned was [Decedent], who appeared to be having labored breathing. As I was the first medical doctor to arrive on the scene, I took control of the care of [Decedent] from Dr. Noah Agard, the treating dentist.

[¶ . . .¶]

To the best of my recollection, I have never treated or seen [Decedent] or

7

    otherwise considered her to be my patient prior to rendering the emergency treatment on April 10, 2003.

Doc. # 75 at ¶¶ 2-5, 9.

In addition, Defendant cites the Declaration of Karen Y. Olivares, the risk manager for Family Healthcare Network, which states, in pertinent part:

> FHCN does not offer emergency care to patients as does, for example, a hospital with an emergency room. However, FHCN maintains a "Code Blue" system to respond to an emergency should one occur on the premises. Under our Code Blue system, a Code Blue is called using the overhead page by the individual who is on the scene of an emergency and believes they need assistance. Once the Code Blue is called the medical provider(s) in the vicinity respond along with their Patient Care Associates ("PCAs"), who are medical assistants. The responders form a "team." The team consists of whichever provider takes the lead along with any other provider that may remain to assist, along with the PCAs. [¶] FHCN does not assign specific providers to teams. Nor does FHCN have a particular staff assigned to be "on call" at our sites to be emergency responders. None of the providers is contracted to respond to an emergency. However, all employees are expected to follow the Code Blue policy, so that if a Code Blue is called, staff are expected to respond if they are available.

Doc. # 74 at ¶¶ 4, 5.

Plaintiff contends Dr. Sanchez owed Decedent a duty of care prior to the emergency based on Dr. Sanchez' duties as described in his job description and based on his role as a medical care provider responding to a code blue. In support of Plaintiffs' contention, Plaintiffs cite the description of the "Code Blue" procedure as set forth in the Olivares Declaration quoted above. Plaintiff also points to Dr. Sanchez's job description which provides, *inter alia* that Dr. Sanchez is tasked to "Assist in the assurance of appropriate clinical procedures and the maintenance of up to date clinical protocols." Doc. # 78 at 19:26-27. As the court understands Plaintiff's reasoning, the fact that Dr. Sanchez is required by his job description to "assist in the assurance of appropriate clinical procedures and maintenance of up to date clinical protocols," leads to the conclusion that he has a duty to any patient that may have need of the Code Blue protocol. The court disagrees.

First, the Code Blue procedure quoted above that both parties cite in support of their positions describes a procedure that relies on the *voluntary* participation of un-designated

8

providers who happen to be in the vicinity and think they can help. The mere *expectation* that staff *will* respond does not create a legal duty *to* respond. The crucial question in this regard is whether, under the facts of this case, physician willingness to participate in future "Code Blue" interventions would be diminished if the court were to decline to immunize Dr. Sanchez from liability for his participation in the Code Blue that was called on Decedent's behalf. The answer most certainly is that physician willingness to participate in future Code Blue events would be diminished if responding physicians had to consider that they could be called upon to defend themselves in a malpractice proceeding if the resuscitation attempt is unsuccessful.

Second, Plaintiffs reliance on Dr. Sanchez's job description for the proposition that Dr. Sanchez had a pre-existing duty to Decedent because he was required to "[a]ssist in the assurance of appropriate clinical procedures and the maintenance of up to date clinical protocols" is unavailing. The focal point of this quote from Dr. Sanchez's job description is the word "assurance." The job tasked by this part of the job description is not the performance of any particular clinical function, but rather the process of assurance that the clinical procedures provided by the clinic are appropriate and up to date. See Elam v. College Park Hospital, 132 Cal.App.3d 332, 346 (4th Dist. 1982) (applying doctrine of corporate negligence where hospital failed to *assure* competence of medical staff). Assurance activities, as described in Elam, are activities that look at the training, experience and qualifications of persons performing particular functions, among other things. Assurance is therefore not the performance of any particular task, but the inquiry into how well the task is performed. Plaintiffs' proffered material facts do not raise a disputed issue of material fact as to whether Dr. Sanchez's participation in the Code Blue was carried out in the absence of a pre-existing duty to Decedent.

The court concludes that response to a "Code Blue" at Family Healthcare Network is precisely the sort of volunteer activity that is protected by the Good Samaritan statutes.

9

When a Code Blue is called, public policy favors a situation where physicians in the area go to the scene to render aid because they can; not avoid the scene because their efforts will place them in substantial risk of getting sued. For that reason, the court will grant Defendant's motion for judgment as to liability arising from the actions of Dr. Sanchez.

**III. Expert Testimony and F.R.C.P. 26(a)**

Plaintiffs designated two expert witnesses, Dr. Kent T. Shoji, M.D., and Dr. Richard Boudreau, M.D., D.D.S. Each expert witness provided a "Complete Statement of Expert's Opinions and the Basis and Reasons Therefore" pursuant to Rule 26(a)(2)(A)[1] of the Federal Rules of Civil Procedure (hereinafter "Rule 26 Statements"). Dr. Shoji's Rule 26 Statement concerned care provided by Dr. Sanchez; Dr. Boudreau's Rule 26 Statement concerns the care provided by Dr. Agard. Because the court will conclude that Dr. Sanchez is immune from liability and that no liability can arise from his actions, Defendant's contentions with regard to Dr. Shoji's Rule 26 Statement need not be addressed.

With regard to Dr. Boudreau's Rule 26 Statement, Defendant contends that the Statement violates Rule 26(a)(2) by failing to make complete statement of expected expert testimony with respect to causation. Defendant contends that, pursuant to Rule 37, the remedy for failure to abide by the requirements of rule 26(a)(2) is exclusion of evidence referenced in the report from trial. Rule 37(c)(1). From there, Defendant reasons that since Dr. Boudreau's Rule 26 Statement failed to meet the requirements of the rule with respect to causation, Plaintiffs are precluded from offering evidence of causation at trial. Thus, Defendant contends that Defendant is entitled to summary judgment as to the actions of Dr. Agard because Plaintiffs will not be able to prove causation by any admissible evidence. For the reasons that follow, the court will find Defendant's argument not persuasive.

Rule 26(a)(2) requires the disclosure of all witnesses who will give expert testimony

---

[1] All reference to "Rules" hereinafter are to the Federal Rules of Civil Procedure unless otherwise specified.

10

at trial. Pursuant to Rule 26(a)(2)(B), the expert witness's disclosure must "be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefore . . ." as well as other information not at issue here. It is Defendant's contention that Dr. Boudreau's Rule 26 Statement sets forth only minimal conclusory statements regarding causation that fail to meet Rule 26's requirement for a "complete statement."

Dr. Boudreau's Rule 26 Statement specifies seven acts or omissions occurring before the dental procedure in which Dr. Agard's care is alleged to have been below the standard of care, primarily because Dr. Agard allegedly failed to obtain a full medical history sufficient to indicate the nature of Decedent's underlying condition. The Statement then lists an additional six specific instances where Dr. Boudreau's Statement contends Dr. Agard's care fell below the standard, primarily because Dr. Agard allegedly failed to assure access to albuterol, epinephrine and oxygen at the site of the procedure prior to the procedure. Dr. Boudreau's Statement also alleges Dr. Agard should have consulted with a medical doctor prior to the procedure. At the end of Dr. Boudreau's Statement as to the specifics of Dr. Agard's performance, the following is alleged:

> I believe that Dr. Agard, having fallen below the appropriate standard of dental practice in the manner outlined above, *resulted in* Decedent's inability to recover from the respiratory distress that she suffered on June 6, 2003. ¶ I will testify regarding Dr. Agard's failure to timely administer albuterol, oxygen and epinephrine to Decedent during the time she was experiencing a respiratory arrest during the Procedure.

Rule 26 Statement of Dr. Boudreau at ¶ 14, Doc. # 76-3 (italics added).

A major purpose of the revision of Rule 26 to its present form in 1993 was to "accelerate the exchange of basic information about the case and to eliminate the paper work involved in requesting such information, and the rule should be applied in a manner to achieve those objectives." Advisory Committee Notes on the 1993 Amendments. To serve this purpose, the expert's report "must not be sketchy, vague or preliminary in nature." Finwall v. City of Chicago, 239 F.R.D. 494, 501 (N.D. Ill. 2006). "Expert reports must

11

include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions . . . [because] an expert who supplies only an ultimate conclusion with no analysis supplies nothing of value to the judicial process." Id.

Although Dr. Boudreau's Rule 26 Statement does not use the word "caused" or "causation," and is perhaps less extensive than may be desired, the Statement nevertheless fairly sets forth both the witness's opinion with regard to causation and the reasons therefore. The words "resulted in" that are italicized in the foregoing statement can reasonably be read as "caused." With that in mind, it is evident to a non-medical reader that Plaintiffs' expert witness will opine that Dr. Agard's performance fell below the standard of care as specified in the previous thirteen paragraphs causing a delay in the administration in albuterol, oxygen and epinephrine beyond the time where the administration of those treatments could reverse Decedent's respiratory distress.

It is apparent to the court that Defendant derived a similar understanding from Dr. Boudreau's Rule 26 Statement because the portions of the Deposition of Richard Boudreau, that are included as Defendants' exhibit to the Declaration of Todd A. Pickles, Doc. # 76, indicate Defendant questioned Dr. Boudreau at some length as to his theory of causation during the deposition. See e.g., Doc. # 76-4 at pages 9-10. To the extent Defendant may be contending that Plaintiffs' theory of causation needs to be stated in greater physiological detail, that contention is rejected. For purposes of notifying Defendant as to the substance of the expert's testimony, it is sufficient for purposes of discovery and preparation of rebuttal that it is the expert's opinion that the outcome of the procedure may have been more favorable but for the alleged delay in the administration of albuterol, oxygen and epinephrine.

Even if Dr. Boudreau's Rule 26 Statement is technically deficient in some respect there is no prejudicial impact that would warrant exclusion of Dr. Boudreau's expert testimony. Exclusion sanctions based on discovery violations are generally improper absent undue prejudice to the opposing side. Amersham Pharmacia Biotech, Inc. v. Perkin, 190

F.R.D. 644, 648-49 (N.D.Cal. 2000). Here, there is no prejudice because Defendant had the opportunity to depose Dr. Boudreau and took full advantage of that opportunity. In that regard, Defendant appears to have fully availed itself of the opportunity to make its inquiries into Dr. Boudreau's theory of causation. A close reading of Defendant's motion to exclude expert testimony on the issue of causation reveals no allegation of prejudice.

The court finds Dr. Boudreau's Rule 26 Statement does not violate Rule 26 by failing to fully state Dr. Bordeau's opinion on the issue of causation and the reasons therefore. Further, even if Dr. Boudreau's Rule 26 Statement does violate Rule 26 on the ground raised by Defendant, there is no prejudice that would warrant exclusion of the expert testimony from trial.

**IV. Sufficiency of Plaintiffs' Evidence of Causation**

Defendant contends that, even if Plaintiffs' evidence of causation in the form of the expert testimony is not subject to exclusion, it is still insufficient to withstand the motion for summary judgment. In resolving this issue, it is important to keep in mind that liability cannot be based on the acts or omissions of Dr. Sanchez because he, and other voluntary providers responding to the Code Blue, are immune under California's Good Samaritan statutes. As Plaintiffs point out, under the Federal Tort Claims Act, the defendant United States is liable for claims only to the extent a private party would be liable under similar circumstances. 28 U.S.C. section 1346(b). Thus, liability against Defendant cannot arise as a result of acts or omissions by Dr. Sanchez. The court's analysis of the sufficiency of Plaintiff's claim with regard to causation must therefore focus on the causal link the expert testimony establishes between Dr Agard's acts or omissions and Decedent's harm. In this regard, Dr. Soji's Rule 26 Statement or subsequent deposition are of no value because they focus exclusively on the alleged acts or omissions of Dr. Sanchez.

As discussed above, Plaintiffs' theory of causation with respect to Dr. Agard is that the failure to adequately inquire into Decedent's medical history and failure to adequately

prepare for the eventuality of Decedent suffering an asthmatic attack during the procedure caused a delay in the administration of oxygen, albuterol and epinephrine. In addition to the information contained in Dr. Boudreau's Rule 26 Statement, Dr. Boudreau's deposition makes it clear that Plaintiffs contend the failure to timely intervene in the course of Decedent's bronchospasm by delivering oxygen albuterol and epinephrine caused a chain of physiological events that could not be reversed by later treatment. As Dr. Boudreau's Deposition puts it:

> [Timely administration of oxygen albuterol and epinephrine] just could have cut off the chain of events that occurred. That's all. It is pretty simple.
>
> [¶ . . . . ¶]
>
> [Decedent] was in severe respiratory distress. The albuterol was not given in a timely fashion. Not until Dr. Sanchez appeared later and he is assembling the nebulizer to give [Decedent] a mist because as albuterol even registered in this case at all and this patient was in severe distress with a [oxygen saturation] of low 80's and nobody thought about epinephrine. [¶] If they thought about it, why wasn't it administered? And this part of the recipe. This is a piece of the puzzle that was just inappropriately delivered, it was not delivered at all. To me, that was the cause of the whole chain. It could have been stopped.

Doc. # 78 at 14.

Dr. Boudreau based this opinion on "background, training, and experience, literature , and case reviews."

Dr. Boudreau's opinion, although perhaps worded insuccinctly makes clear Plaintiffs' theory of causation. The question is whether this theory is sufficient to state a prima facie case for causation in this case. The general rule in medical malpractice cases is that "the evidence must be sufficient to allow the jury to infer that in the absence of the defendant's negligence, there was a reasonable medical probability the plaintiff would have obtained a better result. Alef v. Alta Bates Hosp., 5 Cal.App.4th 208, 216 (1st Dist. 1992). Where the actions is based on California's Wrongful Death statute, the "plaintiff must prove the death was 'caused by' the defendant's wrongful action, i.e., the wrongful act or neglect was a cause in fact of the death. [Citations.] To be a cause in fact, the wrongful act must be a 'substantial

14

factor in bringing about' the death." Bromme v. Plavitt, 5 Cal.App.4th 1487, 1497-98 (3rd Dist. 1992). "The law is well settled that a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case." Id. at 1498.

Defendant contends that Plaintiffs' claim must fail as a matter of law because Plaintiffs present no evidence that there is a probability of greater than 50 percent that Plaintiff would have survived absent the alleged negligence. To the extent it is Defendant's contention that Plaintiffs must prove that it is more likely than not that Decedent would not have died but for Dr. Agard's alleged negligence, the court does not disagree with Defendant's statement of the standard of proof. In Jones v. Ortho Pharmaceutical Corp., 163 Cal.App.3d 396 (2nd Dist. 1985), the court pointed out that the standard of "more likely than not" means that there must be something more than a 50-50 chance that the injury was the result of the negligence. Id. at 402-404. Thus, the requirement that Plaintiff show a probability greater than 50 percent that Decedent would not have died absent Dr. Agard's alleged negligence is just another way of saying that Plaintiff must prove it is more likely than not Decedent's death was caused by Dr. Agard's negligence.

However, if it is Defendant's contention that Plaintiffs' claim must fail because Plaintiffs' medical expert did not make a formal pronouncement in his deposition or Rule 26 Statement that there is greater than a 50 percent chance that Decedent would have survived absent the alleged negligence, the court finds the cases cited by Defendant do not support that contention. To some extent, it appears from the cases that Defendant has cited that Defendant may be under the impression that a plaintiff must offer quantitative proof of a greater than 50 percent chance of survival in a California wrongful death action. In Bromme, as well as in Duarte v. Zachariah, 22 Cal.App.4th 1652 (3rd Dist. 1994), the courts dealt with plaintiffs/decedents who had underlying diseases that either reduced the plaintiff's/decedent's odds of survival to less than 50 percent even if proper diagnosis and treatment was provided

15

(Bromme), or for whom proper treatment could only slightly improve the odds of survival over non-treatment (Duarte). These cases stand for the proposition that "California does not recognize a cause of action for wrongful death based on medical negligence where the decedent did not have a greater than 50 percent chance of survival had the defendant properly diagnosed and treated the condition." Bromme, 5 Cal.App.4th at 1504-1505. Neither case supports the contention that a plaintiff must offer medical expert opinion of a quantitative probability of 50 percent or greater in order to withstand a motion for summary judgment.

The portion of Dr. Boudreau's Declaration supplied by Defendant in Document 76-4 contains the following statements:

> Q: So are you aware of clinical studies that talk about the survivability rates of the administration of albuterol with respect to asthmatic attacks?
>
> A: I don't have any at my finger tips.
>
> Q: Are you aware of any similar studies with respect to survivability rates of patients having received epinephrine in response to an asthmatic attack?
>
> A: Same answer. I mean, I don't have authors and treatises to quote. It's just things that I just generally review. I don't dwell on it. I can just tell you that they are good. You get albuterol in a timely fashion, the patients do well. Very few of them do poorly.
>
> If you give [epinephrine] when indicated, these patients do well. You stay away from cases like the decedent's here, in this case study. It is not a complex matter. It's just a matter of doing the right thing at the right time.

Doc. 76-4 at 11:6-23.

Although Dr. Boudreau's statements are made without exactness, it is a fair understanding that it is his opinion based on his experience and personal research that, had the administration of albuterol and epinephrine been timely, there would have been a substantially better probability of a positive outcome. Based on Dr. Boudreau's stated opinion that persons having broncospasm who receive timely oxygen, albuterol and epinephrine; as well as Dr. Boudreau's earlier-quoted statement that the failure to have these drugs readily available "resulted in" Decedent's death, the court finds Dr. Boudreau's stated expert opinion is sufficient to create a disputed issue of material fact. While Dr. Boudreau's

somewhat inexact style of opining may not carry the day in front of a jury, the court finds it suffices to get him in front of a jury.

The court concludes Plaintiffs' claim based on the alleged acts or omissions of Dr. Agard is not insufficiently supported by expert testimony as to causation. Plaintiffs proffered expert testimony is sufficient, if only barely so, to establish a disputed issue of material fact. Summary judgment is therefore not warranted.

THEREFORE, in accord with the foregoing discussion, it is hereby ORDERED that:

1. Defendant's motion for summary adjudication as to claims arising from the acts or omissions of Dr. Sanchez is hereby GRANTED.
2. Defendant's motion to exclude testimony of Richard Boudreau, M.D. on the ground of Rule 26 violation is DENIED.
3. Defendant's motion to exclude the testimony at trial of Kent Shoji, M.D. is DENIED as moot at this time.
4. Defendant's motion for summary adjudication as to claims arising from the acts or omissions of Dr. Agard is DENIED.

IT IS SO ORDERED.

Dated:     **March 7, 2008**                              **/s/ Anthony W. Ishii**
                                                  UNITED STATES DISTRICT JUDGE