**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| **UVALDO VALENCIA, et al.,** | ) | **CV F 05 - 0472  AWI GSA** |
| | ) | |
| **Plaintiffs,** | ) | **PRETRIAL ORDER** |
| | ) | |
| **v.** | ) | **Motions In Limine Hearing:** |
| | ) | **September 30, 2009** |
| **UNITED STATES OF AMERICA,** | ) | **10:00 a.m., Courtroom 2** |
| | ) | |
| **Defendant** | ) | **Trial:  October 20, 2009** |
| | ) | **9:00 a.m., Courtroom 2** |
| | | |
| | | **RULES OF CONDUCT** |

The pretrial conference was held on September 3, 2009.   The trial in this matter is set for October 20, 2009.  The parties currently estimate that the trial shall take four to five days.

I.  Jurisdiction and Venue

Jurisdiction appears appropriate under the Federal Torts Claims Act, 28 U.S.C. §§ 1331 and 1346(b).  Venue appears appropriate pursuant to 28 U.S.C. § 1402(b).  The United States is the proper defendant pursuant to 28 U.S.C. § 1346(b).

II.  Jury Trial

Pursuant to 28 U.S.C. § 2402, an action brought under the FTCA will be tried by the Court without a jury.  The trial is set to begin on October 20, 2009.  Because of scheduling conflicts with the United States' retained experts, the United States does and will request that it

1    be permitted to call these experts to testify on October 26 and 27, 2009.

2    III.  Facts

3         A.  Undisputed Facts

4         1.)    Decedent Gracia Valencia de Viveros was a patient at FCHN on April 10, 2003.

5         2.)    Decedent Gracia Valencia de Viveros was 60 years old when she died.

6         B.  Disputed Facts

7         Plaintiffs' Position

8         1.      There is a dispute among the Parties as to the exact "timeline" of

9                 events that occurred in the negligent administration and care in the

10                administration of treatment and care of the Decedent on April 10,

11                2003.

12        2.      There is a dispute among the parties pertaining to Dr. Agard's

13                review of Decedent's Dental and Medical History prior to

14                beginning the April 10, 2003, tooth extraction.  Plaintiffs contend

15                Decedent was never provided and required to complete a detailed

16                written questionnaire requiring her to disclose the facts of her

17                respiratory condition; severity of said condition; and utilized

18                medication for treatment.  Plaintiffs' further contend that Dr. Agard

19                breached the requisite standard of care by failing to require

20                Decedent to complete such a questionnaire and for also failing to

21                thoroughly review Decedent's Medical and Dental Histories.3.

22                There is a dispute among the parties about whether a medical

23                consult was required by Dr. Agard before he began the April 10,

24                2003, tooth extraction.

25        4.      There is a dispute among the Parties as to whether the requisite

26                standard of care required that Albuterol, Oxygen, and Epinephrine,

27

28                                              2

be immediately available (i.e. placed in arm's reach on the bracket table), to Dr. Agard throughout the entirety of a tooth extraction on an ASA II, anethsnatised, asthmatic, such as Decedent.

5.  There is a dispute among the parties as to whether the timely administration of Albuterol to Decedent by Dr. Agard would have resolved Decedent's severe bronchospasm, thus preventing her complete respiratory failure, which ultimately led to Decedent's death.

6.  There is a dispute among the Parties as to whether the timely administration of Albuterol to Decedent by Dr. Agard would have resolved Decedent's severe bronchospasm, thus preventing her complete respiratory failure, which ultimately led to Decedent's death.

7.  There is a dispute among the Parties as to whether the requisite standard of care required Epinephrine to be administered by Dr. Agard to Decedent considering Epinephrine was never administered to Decedent by Dr. Agard on April 10, 2003, and whether Dr. Agard breached the standard of care in failing to administer epinephrine.

8.  There is a dispute among the Parties as to whether Dr. Agard's failure to have Albuterol and Epinephrine immediately available on the bracket table and his failure to immediately provide Decedent Oxygen when she informed him that she was suffering from a bronchospasm, was a substantial factor in causing Decedent's death.

9.  There is a dispute among the Parties as to whether the failure to

3

timely administer Albuterol to Decedent by Dr. Agard, was a
substantial factor in causing Decedent's death.

10.   There is a dispute among the Parties as to whether the failure by
Dr. Agard and to ever administer Epinephrine to Decedent on April
10, 2003, was a substantial factor in causing Decedent's death.
Defendant did not exercise the necessary degree of skill in treating
decedent.  As Plaintiffs' expert Richard Boudreau, D.D.S. and Kent
Shoji, M.D. have testified, Dr. Agard failed to have albuterol and
epinephrine available for a patient who had a history of asthma and
chronic obstructive pulmonary disease prior to performing the
tooth extraction and defendant Dr. Agard failed to timely
administer albuterol and failed to administer epinephrine at all.
Defendant Dr. Agard failed to have an asthma inhaler containing
albuterol, and a syringe containing epinephrine readily available to
control the foreseeable severe bronchospasm during the procedure
and then to timely administer these medications to a patient having
a severe bronchospasm.

The albuterol was not even ordered until ten (10) minutes
after the bronchospasm developed and, even then, had to be mixed
in a solution for administration.  But for Defendant's failure to
exercise the requisite degree of skill in having an inhaler, albuterol,
and epinephrine on hand, and the failures of timely albuterol
administration and the failure to administer epinephrine, decedent
would not have died as a result of her respiratory attack while
undergoing the tooth extraction.  As such, Defendants are liable for
damages for causing decedent's death.

4

Defendant's liability expert, Stanley F. Malamed, D.D.S., wrote a book regarding emergencies in the dental office.  His book contains an entire chapter regarding asthmatic attacks.  This is because the possibility of an asthmatic attack in the dental office is so well established and foreseeable that there is a well-known set of procedures to deal with this situation.  Dr. Malamed's own book states that the appropriate procedure for dealing with an asthmatic attack is the prompt administration of albuterol followed by administration of epinephrine.

While Dr. Malamed tried to contend in his deposition that this was simply the "best practice" and not "the standard of care," his entire book is based upon peer reviewed literature which establishes the standard of care.  The standard of care is what a reasonable dentist is required to do under the same or similar circumstances, and the prompt administration of albuterol and the use of epinephrine have been established for years and years as the appropriate practice and method of dealing with a severe bronchospasm in the dental office.  All Dr. Malamed's book does is restate the common practice from the peer-reviewed literature.  In a sense medical or dental school textbooks are like legal hornbooks or a book that restates the law – they are a restatement of commonly accepted practice.  A medical or dental textbook is not an original research article on some newly discovered gene therapy based on a double-blinded study.  All it is a restatement of what commonly accepted practice provides.  Here, the appropriate way to deal with a severe bronchospasm was nothing new or novel in

5

the year 2003 and had been established for many years.

In the case at hand, there was at least a ten (10) minute delay before albuterol was even ordered, much less administered, in response to the decedent's severe bronchospasm.  Upon an appropriate Motion in Limine, Dr. Malamed's testimony may be excluded at the time of trial because he utilizes an improper standard in regards to the standard of care.  Dr. Malamed testified in his deposition that the standard of care was a subjective rather than an objective standard.  According to Dr. Malamed, if defendant Dr. Agard were to testify that defendant Dr. Agard subjectively believed that when he was treating the decedent he was complying with the standard of care, then defendant Dr. Agard would meet the standard of care.  Not only is this argument circular, but it means that any particular healthcare practitioner in any situation only has to say that in their subjective opinion they believe they were doing the right thing and it would make it so. This is an improper standard.  The bottom line is that the literature in this area concretely establishes that the manner of dealing with a severe bronchospasm in a patient with preexisting asthma and C.O.P.D. is prompt administration of albuterol followed by epinephrine.  The standard of care was breached in this case.

United States' Position

1.    Whether Dr. Agard met the standard of care in reviewing Decedent's "medical history," including specifically whether the standard of care was met when Dr. Agard reviewed the medical history contained in Decedent's dental charts and relied upon Decedent's own representations as to her medical history, or whether

Dr. Agard was required to have further requested access to the medical charts and records maintained by FHCN's medical clinic.  (The United States contends Plaintiffs have waived this theory of liability as set forth below).

2.   Whether Dr. Agard met the standard of care in inquiring of the status of Decedent's asthma on February 25, 2003, and April 10, 2003, including specifically whether the standard of care was met when Dr. Agard inquired of Decedent as to the frequency, severity, and timing of Decedent's asthma attacks and whether Decedent used an albuterol inhaler to control her asthma, or whether an additional inquiry was required.

3.   Whether Dr. Agard met the standard of care of proceeding with a tooth extraction procedure on a person with asthma, including specifically whether the standard of care was met when Dr. Agard, having reviewed the medical history in the dental charts, inquired of Decedent as to the status of her asthma, and physically examined Decedent, decided to proceed with the extraction, or whether the standard required him to get medical clearance from a physician.  (The United States contends Plaintiffs have waived this theory of liability as set forth below).

4.   Whether Dr. Agard met the standard of care in determining whether Decedent had her albuterol inhaler with her on April 10, 2003 at the start of the procedure, including specifically whether the standard of care was met when Dr. Agard inquired of Decedent whether she had her inhaler with her and relied upon Decedent's representations that her inhaler was in her purse which was on the counter in the dental operatory, or whether the standard of care required Dr. Agard to have taken physical control of the inhaler or had Decedent physically remove it from her purse and place it at arm's reach.

5.   Timing of when Decedent first indicated to Dr. Agard that she was having breathing difficulties and the level of breathing difficultly she was experiencing at

7

that time.

6.      Whether Dr. Agard met the standard of care in responding to Decedent's indication of breathing difficulties, including specifically whether the standard of care was met when Dr. Agard instructed Decedent to retrieve her inhaler.

7.      Whether Dr. Agard met the standard of care in responding to Decedent's indication of breathing difficulties, including specifically whether, when Decedent's inhaler could not be located, Dr. Agard instructed that a Code Blue be called so that albuterol located on the crash cart could be brought in the operatory for administration to the Decedent and so that medical providers would respond to assist in treating Decedent's breathing difficulties.

8.      Timing of when Dr. Agard instructed that a Code Blue be called and whether Dr. Agard called for the Code Blue or whether someone else called for the Code Blue.

9.      Timing of when Dr. Sanchez and Nancy Banuelos responded to the Code Blue, and when the crash cart arrived at the operatory.

10.     Whether Decedent suffered respiratory arrest or had 0 blood pressure at any point while in the care of Dr. Agard before the arrival of Dr. Sanchez and Nurse Banuelos.

11.     Whether there is greater than 50% chance that Decedent would not have died but for Dr. Agard's alleged negligence.

C.  Disputed Evidentiary Issues

Plaintiffs's Position:

Plaintiffs expect to move to exclude or limit the following testimony or evidence or otherwise preclude the Defendant from presenting the following testimony or evidence:

1.      Testimony of Dr. Malamed regarding the standard of care for medical and dental malpractice as being subjective, whatever Dr. Agard thought was reasonable at the time.  The standard is not

subjective.  If the standard were subjective, it would swallow the

rule.  As in any medical or dental malpractice action, the Plaintiff

must establish: the duty of the professional to use such skill,

prudence, and diligence as other members of his profession

commonly possess and exercise; a breach of that duty; a causal

connection between the negligent conduct and the resulting injury;

and actual loss or damage resulting from the professional's

negligence." *Budd v. Nixen* 6 Cal.3d 195, 200 (1971) (emphasis

added).   To establish medical malpractice, a plaintiff must show

that a health care practitioner did not exercise that degree of skill in

both diagnosis and treatment that is ordinarily possessed and

exercised by other members of the profession in similar

circumstances. *Landeros v. Flood* 17 Cal.3d 399, 408 (1976).

When a health care practitioner's conduct fails to meet this

standard of care, and that failure causes harm to the patient,

liability is imposed. *Klein v. Children's Hospital Medical Center*

46 Cal.App.4th 889, 897 (1996).

2.   Plaintiffs' Decedent's pre-existing conditions do not exonerate Dr.
Agard or any other health provider from liability when breaching
the standard of care.  CACI 3928,  "Unusually Susceptible
Plaintiff" provides as follows:  "You must decide the full amount
of money that will reasonably and fairly Compensate [name of
plaintiff] for all damages caused by the wrongful Conduct of [name
of defendant], even if [name of plaintiff] was more Susceptible to
injury than a normally healthy person would not have suffered
similar injury."  The tortfeasor takes the person he injures as he

1  finds him.  If, by reason of some preexisting condition, his victim

2  is more susceptible to injury, the tortfeasor is not thereby

3  exonerated from liability."  (*Rideau v. Los Angeles Transit Lines*

4  124 Cal.App.2d 466, 471(1954), internal citations omitted.).

5  3.   Subsequent medical malpractice is foreseeable, and Dr. Agard is

6      liable for any additional harm to decedent GRACIA VALENCIA

7      DE VIVEROS resulting from the acts of others in providing aid

8      that decedent reasonably required, even if those acts were

9      negligently performed.  CACI 3929 " Subsequent Medical

10     Treatment" provides as follows: "If you decide that [name of

11     defendant' is legally responsible for [name of Plaintiff]'s harm,

12     [he/she/it] is also responsible for any additional harm resulting

13     from the acts of others in providing aid that [name of plaintiff]'s

14     injury reasonably required, even if those acts were negligently

15     performed."  This rule applies in cases of healthcare negligence

16     where there is a first treating health care provider and subsequent

17     treatment by others.  *See Maxwell v. Powers* (1994) 22 Cal.App.4th

18     1596, 1607-1608.  This includes subsequent paramedic or hospital

19     treatment.

20  4.   Testimony regarding any medical bills paid by a collateral source

21      should not be admitted.  Whether decedent's medical bills were

22      paid by collateral sources is irrelevant to the subject matter of this

23      action, and not calculated to lead to the discovery of admissible

24      evidence.  *Hrnjak v. Graymar*, (1971) 4 Cal.3rd 725.  The full

25      amount of the medical charges are admissible.  *Hanif v. Housing*

26      *Authority of Yolo County*, (1988) 200 Cal.App.3d 635, 640;

27

28                                    10

*Nishahama v. City and County of San Francisco*, (2001) 93 Cal.App.4th 298.

5.     Any reference, any suggestion, any argument or comment on the effect of Civil Code § 1431.2, Proposition 51, which addresses Joint and Several Liability.  Defendant must be excluded from making any reference to the effects of Civil Code § 1431.2, Proposition 51, as limiting the economic damages.  An award of economic damages remains the joint liability of a tortfeasor regardless of the degree of fault of that particular tortfeasor.  It is only non-economic damages which are assessed based upon the percentage degree of fault.  See Civil Code § 1431.2.  CACI 3902 "Economic and Noneconomic Damages" addresses the issue and concludes by informing the jury: "you will be asked on the Verdict form to state the two categories of damages separately.  The consideration of economic and noneconomic damages is to be based upon the evidence presented in the case.  The $250,000 cap on non-economic damages does not affect the economic damages recovery.

<u>United States' Position:</u>

The United States expects to move to exclude or limit the following testimony or evidence or otherwise preclude Plaintiffs from presenting the following testimony or evidence:

1.     Fact or opinion testimony that Dr. Agard failed to halt, postpone, or alter the course of treatment due to Decedent's alleged history of breathing difficulties until he received clearance for the procedure from a medical doctor or reviewed medical records beyond those kept in the dental clinic.  In particular, the United States moved for summary judgment on the basis, *inter alia,* that Plaintiffs failed

to meet their burden of establishing causation with respect to the theories of liability that (1) Dr. Agard did not halt or alter the tooth extractions to get a medical clearance prior to performing the procedure; and (2) Dr. Agard did not halt or alter the tooth extractions to review medical records beyond those maintained in the dental clinic.  Docket No. 72 (United States MPA), at 15-19.  In their Opposition, Plaintiffs did not rebut or even address the United States' motion and evidence on these two theories of liability.  Thus, Plaintiffs have waived any argument or evidence it now presents at trial on these two theories of liability.  *See* Docket No. 82 (United States' Reply Brief), at 13.

2.      Opinion testimony by Plaintiffs' expert Dr. Richard Boudreau, D.D.S. as to the standard of care applicable to a general dentist in preparing to treat an asthmatic patient in a dental clinic.  Dr. Boudreau is an oral and maxillofacial surgeon who performs most of his procedures under general anesthesia in his offices.  His practice and typical patients are markedly different than the present situation.  Therefore, Dr. Boudreau is not qualified to render expert opinion on this issue.  *See* Fed.R.Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

3.      Opinion testimony by Plaintiffs' expert Dr. Richard Boudreau, D.D.S., that Dr. Agard's conduct, if negligent, was a substantial factor in the death of Decedent.  Dr. Boudreau's has presented no objective or factual basis for any causation opinion.  Rather it is unsupported *ipse dixit* and thus it is inadmissible under Federal Rule of Evidence 702.  *See* Fed.R.Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002).

4.      Opinion testimony by Plaintiffs' expert Dr. Kent T. Shoji, M.D., that Dr. Agard's

12

conduct, if negligent, was a substantial factor in the death of Decedent.  Dr. Shoji has presented no objective or factual basis for any causation opinion.  Rather it is unsupported *ipse dixit* and thus it is inadmissible under Federal Rule of Evidence 702.  *See* Fed.R.Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002).

5.  Opinion testimony by Plaintiffs' expert Dr. Kent T. Shoji that standard of care required FHCN to have its medical providers be certified for advanced cardiac life support ("ACLS") in order to respond to a "Code Blue" call.  This opinion with respect to ACLS certification was not in Dr. Shoji's expert report produced on April 27, 2007.  As such, it is inadmissible under the Federal Rules of Civil Procedure.  *See* Fed.R.Civ.P. 26(a)(2); Fed.R.Civ.P. 37.  Moreover, Dr. Shoji has presented no objective or factual basis for this ACLS certification opinion.  Rather it is unsupported *ipse dixit* and thus it is inadmissible under Federal Rule of Evidence 702.  *See* Fed.R.Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002).

6.  Evidence of medical expenses incurred by Decedent or paid on Decedent's behalf.  In the course of settlement discussions, Plaintiffs provided to the United States some bills from Sierra View District Hospital ostensibly regarding the medical care rendered to Decedent from April 10, 2003 through June 6, 2003.  Under California law, which governs the amount of compensatory damages which Plaintiffs may be awarded, only medical costs actually paid may be awarded.  *See Hanif v. Housing Authority*, 200 Cal. App. 3d 635, 643-44 (1988).  Absent proof that either Decedent paid any expenses, or that Medi-Care or some third-party insurer paid the expenses on Decedent's behalf, Plaintiffs are not entitled to

recovery for any costs associated with Decedent's care.  No proof was provided during discovery nor has any been produced to date.

7. Testimony or evidence that Dr. Agard breached the standard of care by failing to have Mrs. Valencia complete a more detailed questionnaire. *See, supra*, B.4.2. The first time this issue has been identified by Plaintiffs is in the context of this Joint Pretrial Conference Statement.  No expert testimony has ever been provided on this point, it was not disclosed in the expert witness statements nor through deposition testimony.  Thus Plaintiffs are precluded from raising this new theory of liability at trial.

8. Plaintiffs have identified as a potential exhibit a "DHHS – response to litigation report (27 July 2005)*." See, infra*, § 11.36.  This exhibit appears to be a document produced by a Department of Health and Human Services attorney at the request of the United States Attorneys' Office in the course of litigation, and is therefore privileged attorney-client communication and attorney work product.  It is unclear how this document came into the possession of Plaintiffs.  To the extent it was through the inadvertent disclosure to Plaintiffs or other parties, the United States will move to exclude this document from evidence and seek a protective order requiring the document be returned or destroyed.

D.  Special Factual Information

Pursuant to Local Rule 16-281(b)(6)(iv), the following special factual information pertains to this tort action for personal injury, wrongful death, or property damage:

**a.      Date, Place, and Nature of Incident; Factual Basis for Defenses**

The incident occurred on April 10, 2003, at FHCN Dental Clinic in Porterville, California.  Plaintiffs allege that Dr. Agard's care and treatment of Decedent in preparation for a dental extraction and in response to an asthma attack fell below the standard of care, and that this negligence was a substantial factor in Decedent's death.

<u>Plaintiffs' Position:</u>

On Thursday, April 10, 2003, at 2:00 pm, Decedent presented for a scheduled dental visit at FCHN's dental services site, located at 1107 West Poplar Ave., Porterville, CA 93257, for extraction of teeth no.12 and 13.  Dr. Agard was the treating dentist. Decedent had been seen in the past by two different FCHN dentists for two prior procedures. Decedent was asthmatic and had a history of chronic obstructive pulmonary disease, which she indicated on the medical history paperwork she filled out prior to her appointment. However, Dr. Agard and other FCHN employees failed to carefully review Decedent's medical and dental history or inquire further regarding what medication she used to control her asthmatic or pulmonary attacks. At 2:40 p.m., on April 10, 2003, Dr. Agard anesthetized Decedent with one carpule of 2% Lidocane with 1:100,000 Epinephrine.  At 3:00 p.m. on April 10, 2003, Dr. Agard performed extraction of root tip no. 12. Decedent complained she was feeling discomfort, so Dr. Agard injected her with an additional dose of Lidocane.  At approximately 3:00 p.m., Decedent indicated a need to stop and informed Dr. Agard she was having breathing difficulty. At approximately 3:07 p.m., Dr. Agard instructed his staff to call a "Code Blue." Approximately 3 minutes after the Code Blue instruction, Nancy Banuelos, RN. responded and instructed staff to call 911 for ambulance support.  Dr. Sanchez, who was employed as a staff physician with FHCN,  responded to the Code Blue. The response "team" had to locate and retrieve the "crash cart" containing Albuterol, Oxygen, and Epinephrine, outside the OB department on the second floor before bringing it to Decedent's location. Approximately 10 to 16 minutes after Decedent complained about her breathing problems.

Dr. Sanchez finally began to administer oxygen via nasal canula and ordered Albuterol. Dr. Sanchez checked Decedent's vital signs.  Decedent's pulse oximatory measured 51. Decedent's respiratory rate measured 48. Decedent's heart rate measured 155. Decedent's blood pressure measured 0. Neither Dr. Agard nor Dr. Sanchez ever administered Epinephrine to Decedent on April 10, 2003.  Dr. Sanchez  only administered Albuterol via nebulizer to Decedent

just prior to the EMTs arrival. At 3:16 p.m. the ambulance arrived on scene.  The EMTs transferred Decedent from the doctor's stool she had been seated on to a gurney and placed her in an upright position. The EMTs continued to administer oxygen to Decedent. By 3:24 p.m. The EMTs were setting up an Albuterol nebulizer. Approximately at 3:24 p.m., The EMTs placed Decedent in ambulance and began her transfer to Sierra View District Hospital.  Decedent suffered complete respiratory failure en route to the hospital at approximately 3:26 p.m.   The ambulance arrived at Sierra View District Hospital Emergency Room and at 3:30 p.m. Decedent had to be intubated. The medical staff at Sierra View District Hospital administered two doses of Epinephrine and one dose of Astropine to restore Decedent's respiratory function. Decedent never regained consciousness and remained in an unconscious state under the care of Sierra View District hospital until her ultimate demise on June 06, 2003.

Plaintiffs' assert Defendants did not exercise the necessary degree of skill in treating Decedent.  As Plaintiffs' experts Doctor Richard Boudreau, D.D.S. and Kent Shoji, M.D. will testify to:

1.      Decedent's medical chart indicated that decedent was asthmatic and had chronic obstructive pulmonary disease.

2       Dr. Agard failed to diligently review Decedent's available medical history or to inquire into Decedent's history of asthma and chronic obstructive pulmonary disease prior to performing the April 10, 2003, tooth extractions.

3.      Dr. Agard failed to seek a necessary medical consult prior to anesthnatising and performing the abovementioned tooth extractions on Decedent.

4.      Dr. Agard failed to ask Decedent whether she had in her possession an asthma inhaler or other asthma medication prior to performing the procedure.

5.      Dr. Agard failed to have an asthma inhaler containing Albuterol, and a syringe containing Epinephrine readily available to control a potential asthmatic attack during the aforementioned procedure.

16

6.      Dr. Agard failed to exercise the requisite degree of skill by failing to have an inhaler, Albuterol, and Epinephrine on hand during said procedure.

7.      Timely administration of Albuterol to Decedent by Dr. Agard would have resolved Decedent's severe bronchospasm, thus preventing her complete respiratory failure, which ultimately led to Decedent's death.

8.      Failure to timely administer Albuterol to Decedent by both, Dr. Agard and Dr. Sanchez, was a substantial factor in causing Decedent's death.

9.      The Requisite standard of care required Epinephrine to be administered by Dr. Agard and Dr. Sanchez to Decedent on April 10, 2003.  This standard was breached by both Drs. Agard and Sanchez by never administering  Epinephrine to Decedent on April 10, 2003.

The competent expert testimony of Doctor Richard Boudreau, D.D.S. and Kent Shoji, M.D. shall conspicuously identify each standard of care Dr. Agard, Dr. Sanchez, FHCN and ultimately the United States, had breached on April 10, 2003, and that each of these breaches individually or collectively, were substantial factors in causing Decedent's ultimate injury; Death.

United States' Position:

On February 25, 2003, Dr. Agard inquired of Decedent concerning the status of her asthma, including when she last suffered an asthmatic attack, the frequency of the attacks, the severity of the attacks and what medication she used to control her asthma, including in response to an attack.  Decedent indicated her asthma was well controlled.  Dr. Agard instructed Decedent to bring her albuterol inhaler with her to the procedure on April 10, 2003.

On April 10, 2003, Dr. Agard inquired of Decedent concerning her asthma and whether she had an albuterol inhaler.  Mrs. Valencia told Dr. Agard that her asthma was well-controlled and that she had her albuterol inhaler in her purse, which was with her in the operatory.  Mrs. Valencia was given a local anesthetic of lidocaine, which she received during prior extractions.

After allowing approximately 20 minutes for the lidocaine to take effect, Dr. Agard began the procedure at approximately 3:00 p.m.  The first tooth was extracted without any difficultly.

17

Dr. Agard then turned to the second tooth.  Mrs. Valencia indicated she felt some discomfort, so Dr. Agard administered a small additional dose of lidocaine.  He then continued with the extraction.  At some point after resuming the extraction (most likely at approximately 3:07 p.m.), Mrs. Valencia raised her hand and indicated she was having problems breathing.  Dr. Agard immediately moved Mrs. Valencia into a seated position.  As a fellow asthmatic, Dr. Agard recognized what he believed was an asthma attack.  Through his assistant Margarita Alvarado, who was also acting as a translator, Dr. Agard asked Mrs. Valencia to get her inhaler from her purse.  Mrs. Valencia, whose breathing at this point was not very labored, got up out of her chair and went to her purse.  She looked through but could not find the inhaler.  When it became clear that Mrs. Valencia could not find her inhaler, Dr. Agard instructed that a "Code Blue" be called. Dr. Agard did so because he knew that a crash cart containing albuterol would respond immediately.

In response to this Code Blue, Nancy Banuelos, a registered nurse, arrived almost simultaneously with a medical assistant bringing a crash cart, which had been located next to the dental clinic on the same floor at FHCN.  Dr. Antonio Sanchez, M.D., arrived immediately thereafter from the medical clinic located the floor below.  The crash cart's and Nurse Banuelos's arrival occurred within 15 seconds to 1 minute of the Code Blue being called, with Dr. Sanchez there within 2 minutes of the Code at most.

Nurse Banuelos began administering oxygen by mask.  Upon his arrival, Dr. Sanchez assumed control of the patient's care and treatment.  Dr. Sanchez began examining Mrs. Valencia, as well as consulting with Dr. Agard.  Dr. Sanchez assessed that Mrs. Valencia had decreased breathing sounds and poor air exchange in her lungs.  He also observed that Mrs. Valencia had begun to become slightly cyanotic—*i.e.*, her lips were turning blue.  He instructed that 9-1-1 be called immediately, and that she begin receiving oxygen through a nasal cannula as

well as albuterol through a nebulizer[1] and venturi mask.  After this first treatment, Mrs.
Valencia's condition improved.

Dr. Sanchez was setting up for a second treatment with albuterol when the emergency
medical technicians ("EMTs") arrived at approximately 3:16.  Mrs. Valencia was transferred to
the EMTs' care.  The EMTs found Mrs. Valencia to be alert and functioning, albeit with labored
breathing and a reduced oxygen saturation level.  After treating Mrs. Valencia at FHCN for
approximately eight minutes, the EMTs moved Mrs. Valencia to the ambulance for transport to
Sierra View District Hospital, departing FHCN at approximately 3:24 p.m.  During transport to
Sierra View District Hospital the EMTs began to set up for a second albuterol treatment.
Unfortunately, before the treatment could be administered she experienced respiratory failure.
This occurred at approximately 3:26 p.m., or approximately ten minutes after the paramedics
assumed care of Mrs. Valencia and twenty minutes after Mrs. Valencia first had breathing
problems.

Although medical personnel at Sierra View District Hospital were able to revive her
respiratory functioning, Mrs. Valencia never regained consciousness.  She remained in a non-
responsive state for approximately two months.  Mrs. Valencia died on June 6, 2003.  The
immediate cause of death was asystole—*i.e.*, cessation of heart activity—with underlying causes
of respiratory failure and anaphylaxis.

### b.   Age, Injuries Sustained, and Economic Damages; Causation

Plaintiffs allege that Dr. Agard's negligence was a substantial factor in Decedent's death
on June 6, 2003.  She was 59 years old at the time of the incident and 60 years old at the time of
death.  Plaintiffs assert economic damages of $620,000.00.

Plaintiffs' Position:

(b)-(c)  Sustained Actual Damages and Harm in Plaintiffs' Wrongful Death Action:

---

[1]      A "cannula" is "a small tube for insertion into a body cavity, duct, or vessel."  A
"nebulizer" is "an atomizer equipped to produce an extremely fine spray for deep penetration of
the lungs."  *See* Merriam-Webster Medical Dictionary.

Decedent is survived by her husband of 33 years, UVALDO VALENCIA (74 years of age), daughter, MARIA VALENCIA (32 years old), son ALEJANDRO VALENCIA (26 years old), son JOSE VALENCIA (approximately 24 years old), son ABEL VALENCIA (23 years old), son SOTERO VALENCIA (29 years old), and son GUSTAVO VALENCIA (30 years old). Plaintiffs' may recover both economic and non-economic damages in claims for Decedents' wrongful death caused by Defendants. (See CACI § 3921; *Quiroz v. Seventh Ave. Center*, 140 Cal.App.4th 1256, 1264 (Year). Plaintiffs' Economic damages include the loss of financial support, funeral and burial expenses, and the reasonable value of household services that the Decedent provided. *Id.* Noneconomic damages are measured by "the value of the benefits the heirs could reasonably expect to receive from the deceased if she had lived." *Allen v. Toledo* 109 Cal.App.3d 415, 423(1980). "These benefits include the personal services, advice, and training the heirs would have received from the deceased, and the value of her society and companionship." *Id.* In medical malpractice actions brought under California law, noneconomic damages are limited to $250,000. *Schwarder v. United States*, 974 F.2d 1118, 1125 (9th Cir. 1992).

Between the time of the injury-producing event of April 10, 2003 and the decedent's death on June 6, 2003, medical bills in the amount of $348,519.11 were incurred [4/10/03 to 5/1/03 - $167,136.49; 5/1/03 to 5/27/03 - $14,348.26; 5/20/03 to 6/6/03 - $167,034.36; Total: $348,519.11].

In this case, Plaintiffs' noneconomic damages reach the full $250,000 allowed under California law. As Decedent's husband and children, Plaintiffs have suffered the loss of Decedent's society and companionship, advice, training, and personal services. Decedent's husband, Uvaldo Valencia, testified in his deposition, he had been married to Decedent for 33 years, and three of their six children—Alejandro, Luis, and Abel—were still living at home at the time of decedent's death on June 06, 2003. Plaintiff, Uvaldo Valencia further emphasized that he and Decedent had a very close and loving relationship. Decedent's daughter, Plaintiff, Maria Valencia, also

testified that her mother was her closest friend and confidant.

Plaintiffs' also claim economic damages based on the loss of Decedent's financial support and her funeral and burial expenses.  Before her death, Decedent was making approximately $1,200 a month, four months out of a year, as a grape picker. Decedent's wages went to supporting herself, her husband, and the three children that lived at home.  Decedent was 60 years of age as of April 10, 2003, and with the continuing loss of income due to Decedent's death; the implication of a life expectancy of 65 years of age for Decedent; Plaintiffs' have lost approximately $30,000.00 in noneconomic damages.

The United States' Position:

Plaintiffs cannot present any evidence that Decedent's chances of surviving her asthma attack were more likely than not affected by any conduct by Dr. Agard.  In particular, Plaintiffs' experts failed to opine based upon any studies, clinical observations or other objective criteria that it was more likely than not that Decedent would have lived had albuterol been administered by Dr. Agard sooner than Dr. Sanchez's arrival.  Similarly, Plaintiffs' experts failed to opine based upon any studies, clinical observations or other objective criteria that it was more likely than not that Decedent would have lived had epinephrine been administered by Dr. Agard sooner than Dr. Sanchez's arrival.  Defendant's expert Dr. Richard Zoraster, M.D., will testify, based upon objective evidence, that there is no basis to conclude that there was a greater than 50% chance that Decedent would not have died had albuterol been administered sooner or had epinephrine been administered.

Additionally, Plaintiffs have not demonstrated that Decedent incurred any expenses related to her hospitalization at Sierra View District Hospital between April 10, 2003 and June 6, 2003.  Finally, Plaintiffs have not established anything more than *de minimis* loss of wages during this time.

**c.    Wrongful Death Related Facts**

Plaintiffs' Position:

See Plaintiffs' Position 6(b).

United States' Position:

As set forth above, the United States will move to preclude a claim of economic damages for medical costs for lack of evidence.

IV.  Relief Sought

Based upon the administrative claim presented to the Department of Health and Human Services, Plaintiffs seek damages in the amount of $620,000.00.

Plaintiffs' Position:

Plaintiffs' seek economic and non-economic damages.  Although the damages recoverable in a wrongful death action for such factors as lost comfort, society, companionship, care and protection have been labeled as "nonpecuniary" because they do not have ascertainable economic value, damages for lost value of economic contributions, personal services, advice or training that would probably have been given, and society, comfort, care, protection and companionship must be monetarily quantified.  Wrongful death damages are measured over a future time period, thus damages for wrongful death must be reduced to present value.  *Fox v. Pacific Southwest Airlines*, 133 Cal.App.3d 565 (4th Dist. 1982).  An award for future earnings is a proper component of pecuniary damages for wrongful death.  Plaintiffs' may recover lost present and future economic support from Decedent, as well as the pecuniary, as opposed to sentimental, value of such factors as lost comfort, society, companionship, care, and protection; however, if the court does not reduce the noneconomic damages to present cash value, it is error under California law.  *In re Air Crash Disaster Near Cerritos*, Cal. On Aug. 31, 1986, 982 F.2d 1271 (9th Cir. 1992).

A Defendant is entitled to have an economic damages recovery discounted to present value, though damages for future noneconomic injuries should not be discounted or reduced to reflect present value.  *Friedman v. C&S Car Service*, 108 N.J. 72, 527 A.2d 871 (1987).  The inclusion of an inflation adjustment in future damage awards does not provide additional

compensation for a plaintiff above and beyond the damages already awarded, but rather, it ensures that the passage of time will not devalue the award because of a general rise in prices for goods and services.  *Bryant v. New York City Health and Hospitals Corp.*, 93 N.Y.2d 592 (1999).   To calculate the present value of Decedent's lost stream of earnings the court should calculate:

> (1) the interest rate or rate of return which the Decedent could reasonably expected to receive on an investment of the lump-sum payment, together with (2) the period of time over which the future loss is reasonable certain to be sustained; and then reduce, or in effect deduct from, the total amount of anticipated future loss whatever that amount would be reasonably certain to earn or return, if invested at such rate of interests over such future period of time; and include in the verdict an award for only the present-worth-the reduced amount-of anticipated future loss.  (*In determining future losses, you may consider such additional income as the evidence shows he would have been likely to receive in the future, such as wage increases due to promotions, increased experience, increased experience, merit raises, and increased productivity, if there is evidence concerning them*). Federal Jury Practice and Instructions (Fourth), Civil, Damages § 85.11, Devitt, Blackmar and Wolff, (1987).

Applying the aforementioned calculators to Decedent's value of lost stream of earnings in an inflation-free economy, the court should find the following calculations: (1) Decedent would have approximately made $4,200.00 for each year that she could have been expected to work (i.e. 2003-2007), totaling $30,000.00: (2) deducted by the appropriate discount rate, reflecting the safest available investment (*annual interest rate average for 10 year t-note (2003-2007) of 4.4% = $184.80*); and (3) the trier of fact should apply the discount rate to each of the estimated annual

earnings, and then add up the discounted installments to determine award (i.e. $184.80 multiplied by 5 years = $924.00).  However the Court should also account the average annual wage increase during said period (3.02%) in calculating total award= $126.84.  As such, the abovementioned $30,000.00, representing Decedent's total lost earnings should be reduced to a present value of $29,710.20.

United States' Position:

Plaintiffs' recovery on the survival claim is limited to lost earnings by Decedent from April 10, 2003 to June 6, 2003 (approximately $6,000-$9,000).  Plaintiffs wrongful death claim is limited to $250,000.00 for general non-economic damages.  Therefore, the total amount of damages available to Plaintiffs is $259,000.00.  The United States disputes all damages.

V.  Points of Law

A.  Plaintiffs' Contentions

Plaintiffs' Position:

1.      Federal Procedural and California Substantive Law Apply to The Case at Bar.

Plaintiffs assert two substantive tort claims pursuant to California law: (1) a wrongful death claim under California Code of Civil Procedure §§ 377.60, et seq., and (2) a survival claim under Code of Civil Procedure §§ 377.20, et seq.  Both claims are premised upon professional negligence and filed against the United States under the Federal Torts Claim Act (hereafter "FTCA"), 28 U.S.C. §§ 2674, 1346(b).  This action is brought pursuant to the FTCA.  As such, the United States is liable for claims brought under the FTCA to the extent a private party would be liable under similar circumstances.  28 U.S.C. § 1346(b).  Here, the torts alleged by Plaintiffs took place in California.  Therefore, California law applies to determine the rights, duties and liabilities involved.  *Molsbergen v. United States* (9th Cir. 1985) 757 F.2d 1016, 1020.

2.      Plaintiffs' Theory of Liability

As in any medical or dental malpractice action, the Plaintiff must establish: the duty of the professional to use such skill, prudence, and diligence as other members of his profession

commonly possess and exercise; a breach of that duty; a causal connection between the negligent conduct and the resulting injury; and actual loss or damage resulting from the professional's negligence." *Budd v. Nixen* 6 Cal.3d 195, 200 (1971) (emphasis added). Likewise, when a decedent's heirs or personal representative maintain an wrongful death action on behalf of the decedent under Code of Civil Procedure § 377, the plaintiff must prove the death was caused by the defendant's wrongful act or neglect, i.e., the wrongful act or neglect was a cause in fact of the death. *Mitchell v. Gonzales*, (1991), 54 Cal. 3d 1041, 1049.

The decedent's surviving heirs and successors in interest may assert a cause of action for wrongful death. Cal. Code. Civ. Pro. § 377.60. In any action for wrongful death arising from negligence, a plaintiff must establish each element of negligence. *Jacoves v. United Merchandising Corp.*, 9 Cal.App.4th 88, 105(1992). To establish medical malpractice, a plaintiff must show that a health care practitioner did not exercise that degree of skill in both diagnosis and treatment that is ordinarily possessed and exercised by other members of the profession in similar circumstances. *Landeros v. Flood* 17 Cal.3d 399, 408 (1976). When a health care practitioner's conduct fails to meet this standard of care, and that failure causes harm to the patient, liability is imposed. *Klein v. Children's Hospital Medical Center* 46 Cal.App.4th 889, 897 (1996). On principles of respondent superior, a hospital may be held liable for its employees' negligent conduct. *Fraijo v. Hartland Hospital*, 99 Cal.App.3d 331, 342 (1979). Here, Defendants did not exercise the necessary degree of skill in treating Decedent. As Plaintiffs' experts, Doctor Richard Boudreau, M.D. and Kent Shoji, D.D.S., will testify to, Dr. Agard failed to fully review decedent's available medical history or to ask the decedent about her history of asthma and chronic obstructive pulmonary disease prior to performing the tooth extraction. Dr. Agard also failed to ask decedent whether she had in her possession an asthma inhaler or other asthma medication prior to performing the procedure. In addition, Dr. Agard failed to have oxygen, an asthma inhaler containing Albuterol, and a syringe containing epinephrine readily available to control a potential asthmatic attack during the procedure. Dr. Sanchez further fell

below the requisite standard of care when he failed to timely administer Albuterol to Decedent after responding to the Code Blue.  Most notably, the Requisite standard of care required Epinephrine to be administered to Decedent on April 10, 2003.  This standard was breached by both Drs. Agard and Sanchez by never administering Epinephrine to Decedent on April 10, 2003.  But for Defendant's failure to exercise the requisite degree of skill in having an inhaler, Albuterol, and Epinephrine on hand, decedent would not have died as a result of her respiratory attack while undergoing the tooth extraction.  As such, Defendant is liable for damages for causing decedent's death.

Moreover, in cases alleging negligence, the proper test for proving <u>causation</u> is the one set out in CACI nos. 430 and 431 (Spring ed. 2007 bound vol.):

CACI 430 provides as follows: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm.  It must be more than remote or trivial factor.  It does not have to be the only cause of the harm."

CACI 431 provides as follows:
"A person's negligence may combine with another factor to cause harm.  If you find that [name of defendant]'s negligence was a substantial factor in causing [name of plaintiff]'s harm, then [name of defendant] is responsible for the harm.  [Name of Defendant] cannot avoid responsibility just because some other person, condition or event was also a substantial factor in causing [name of plaintiff]'s harm"

CACI 3928 "Unusually Susceptible Plaintiff" provides as follows:
"You must decide the full amount of money that will reasonably and fairly Compensate [name of plaintiff] for all damages caused by the wrongful Conduct of [name of defendant], even if [name of plaintiff] was more Susceptible to injury than a normally healthy person would not have suffered similar injury."

The tortfeasor takes the person he injures as he finds him.  If, by reason of some preexisting condition, his victim is more susceptible to injury, the tortfeasor is not thereby exonerated from liability." *(Rideau v. Los Angeles Transit Lines* 124 Cal.App.2d 466, 471(1954), internal citations omitted.)

CACI 3929 " Subsequent Medical Treatment" provides as follows:
"If you decide that [name of defendant' is legally responsible for [name of Plaintiff]'s harm, [he/she/it] is also responsible for any additional harm resulting from the acts of others in providing aid that [name of plaintiff]'s injury reasonably required, even if those acts were negligently performed."

In California, it is well settled that in a personal injury action causation must be proven within a reasonable medical probability based on "competent expert testimony." *Bromme v.*

*Pavitt*, 5 Cal.App.4th 1487, 1498 (1992); *Dumas v. Cooney*, 235 Cal.App.3d 1593, 1604 (1991); and *Simmons v. West Covina Medical Clinic, et al.*, 212 Cal.App.3rd 696, 703-704 (1989).

A plaintiff may recover both economic and non-economic damages in claims for wrongful death.  CACI § 3921; *Quiroz v. Seventh Ave. Center*, 140 Cal.App.4th 1256, 1264.  Economic damages include the loss of financial support, funeral and burial expenses, and the reasonable value of household services that the decedent provided.  *Id.*  Noneconomic damages are measured by "the value of the benefits the heirs could reasonably expect to receive from the deceased if she had lived."  *Allen v. Toledo*, 109 Cal.App.3d 415, 423 (1980)  .  "These benefits include the personal services, advice, and training the heirs would have received from the deceased, and the value of her society and companionship."  *Id*.  In medical malpractice actions brought under California law, noneconomic damages are limited to $250,000.  *Schwarder v. United States*, 974 F.2d 1118, 1125 (9th Cir. 1992).

In this case, Plaintiffs' noneconomic damages reach the full $250,000 allowed under California law.  As decedent's husband and children, Plaintiffs have suffered the loss of her society and companionship, advice, training, and personal services.  As decedent's husband, Plaintiff Uvaldo Valencia, testified in his deposition, he had been married to decedent for 33 years, and three of their six children—Alejandro, Luis, and Abel—were still living at home at the time of decedent's death.  Plaintiff Uvaldo Valencia stated in his deposition that he and decedent had a very close and loving relationship.  Decedent's daughter, Maria Valencia, also testified that her mother was her closest friend and confidant.  Plaintiffs' also claim economic damages based on the loss of decedent's financial support and her funeral and burial expenses.  Before her death, Decedent was making approximately $1,200.00 a month, 3 to 5 months out of a year, as a grape picker. Decedent's wages went to supporting herself, her husband, and the three children that lived at home.

B.  Defendants' Contentions

United States' Position:

The United States intends to raise the following points of law:

1.    To establish medical malpractice under California law, Plaintiffs must prove a duty to use the applicable medical standard of care, a breach of that duty, a causal link between the breach and the resulting injury, and some loss or damages.  *See Ermoian v. Desert Hosp.*, 152 Cal. App. 4th 475, 493 (2007); *Turpin v. Sortini*, 31 Cal. 3d 220, 229-30 (1982).

2.    Plaintiffs can meet their burden of proving negligence with respect to Dr. Agard only by showing that Dr. Agard failed to use the same level of skill, knowledge, and care in diagnosis and treatment as would other reasonably careful general dentists with backgrounds, training and experience similar to Dr. Agard's in performing a tooth extraction on an asthmatic patient in a dental clinic setting. Plaintiffs can meet this burden only by presenting admissible expert testimony on the skill, knowledge, and care in diagnosis and treatment of reasonably careful general dentists performing a tooth extraction on a patient with asthma in a dental clinic setting.  *See* Jud. Council of Cal. Civil Jury Instruction ("CACI") 501; BAJI 6.00.1; *Bromme v. Pavitt*, 5 Cal. App. 4th 1487, 1497-98 (1992).  Specifically, this means that Plaintiffs must prove through expert testimony that a reasonably careful general dentist in performing a tooth extraction on a patient with asthma would:

•    Not relied upon the medical history in the dental chart or Decedent's own representations about her medical history but would have further requested Decedent's medical chart and records from the medical clinic prior to performing the procedure;

•    Not relied upon Decedent's representation that she had her albuterol inhaler with her in her purse but would have demanded that she remove the inhaler and place it in arm's reach or otherwise taken control of the inhaler, and would also have had in the operatory

28

additional albuterol and as well as epinephrine;

•   Have administered albuterol more quickly than it was administered to Decedent; and

•   Have administered epinephrine to Decedent.

3.   Liability may not be imposed based on Dr. Agard's decision not to use epinephrine even if it is determined that epinephrine might have resulted in a better outcome so long as it was medically acceptable to treat the asthmatic attack using albuterol and oxygen.  *See* CACI 506 (it is not negligence to choose one medically accepted procedure over another even if it is later determined that another method may have been a better choice); *see also Barton v. Owen*, 71 Cal. App. 3d 484, 501-502 (1977).

4.   Regardless of proving negligence, in order to recover on any claims Plaintiffs must present evidence that there is greater than 50% chance that Decedent would not have died but for Dr. Agard's alleged negligence.  If Plaintiffs cannot show that Dr. Agard's conduct worsened Decedent's chances—*i.e.*, that it is more than a "possibility" that Decedent would have lived absent negligence—then their claims fail as a matter of law.  *See* Cal. Code of Civ. Proc. § 377.60; *Bromme v. Pavitt*, 5 Cal. App. 4th 1487, 1497-98 (1992); *Duarte v. Zachariah*, 22 Cal. App. 4th 1652, 1658-59 (1994); *Jennings v. Palomar Pomerado Health Sys.*, 114 Cal. App. 4th 1108, 1118-21 (2004).

5.   Damages on Plaintiffs' wrongful death action are limited to only pecuniary loss, such as loss of Decedent's financial support and services, or loss of society or companionship.  *See* CACI 3921; *see also Quiroz v. Seventh Avenue Ctr.*, 140 Cal. App. 4th 1256, 1264 (2006).  Plaintiffs may not recover for the grief or sorrow attendant to Decedent's death or the sentimental value of the loss.  *Id.*

6.   Plaintiffs non-economic damages related to loss of companionship on their

wrongful death action are collectively limited to $250,000.00 under California's Medical Injury Compensation Reform Act (MICRA), Cal. Code Civ. Proc. § 3333.2, which is controlling here. *See Schwarder v. United States*, 974 F.2d 1118, 1125-26 (9th Cir.1992) (holding MICRA applies to FTCA cases).

7. Only economic loss or damage sustained between the time of injury and the time of death is recoverable for Plaintiffs' survival action under Cal. Code Civ. Proc. § 377.34. *See Williamson v. Plant Insulation Co.*, 23 Cal. App. 4th 1406, 1418 (1994). Any alleged pain and suffering by Decedent is not recoverable. *Id.*; *see also Delta v. Sullivan Air Lines, Inc.*, 15 Cal. 4th 288 (1997).

8. Under the FTCA, the United States is not liable for punitive damages even to the extent they are available under state law. 28 U.S.C. § 2674.

## VI.  Abandoned Issues

<u>Plaintiffs:</u>

Plaintiffs' are unaware of any issues raised by the pleadings that have been abandoned by either party.

<u>United States:</u>

The United States concedes that the statute of limitations is not implicated to the extent that Plaintiffs are only seeking to impose liability and damages for conduct on or after April 10, 2003.

## VII.  Witnesses

The following is a list of witnesses that the parties expect to call at trial, including rebuttal and impeachment witnesses.  NO WITNESS, OTHER THAN THOSE LISTED IN THIS SECTION, MAY BE CALLED AT TRIAL UNLESS THE PARTIES STIPULATE OR UPON A SHOWING THAT THIS ORDER SHOULD BE MODIFIED TO PREVENT "MANIFEST INJUSTICE."  Fed. R. Civ. P. 16(e); Local Rule 16-281(b)(10).

A.  Plaintiffs' Witnesses

1)   Uvaldo Valencia

2)   Maria Valencia

3)   Alejandro Valencia

4)   Jose Valencia

5)   Abel Valencia

6)   Sotero Valencia

7)   Gustavo Valencia

8)   Alicia Lopez

9)   Noah Alex Agard, D.D.S.

10)   Antonio F. Sanchez, M.D.

11)   Zinnia Mendez

12)   Margarita Alvarado

13)   Melanie Murphy, D.D.S.

14)   Henry Camilo Cisneros, JR, D.D.S.

15)   Guadalupe Quezada, D.D.S.

16)   Christohper Kolker, M.D.

17)   Godofredo R. Celis, M.D. (Neurologist Progress Notes 04/24/03)

18)   Karen Yvonne Olivares

19)   Monica Mariscal, Paramedic

20)   Allan Ray, Paramedic

21)   Luis Atkins, Paramedic

22)   Hapreet Sandhu, M.D.

23)   Dr. Bellinghausen

24)   Custodian of Records for Dental Records at FHCN's dental services site, located at 1107 West Poplar Ave., Porterville, CA 932

25)   Custodian of Records for Medical Records for FHCN's medical facility, located at 1107 West Poplar Ave., Porterville, CA 932

26)   Custodian of Records, for Medical Billing for Sierra View District Hospital

27)   Custodian of Records, for Medical Records for FHCN, for Decedent, Gracia Valencia

28)   Richard Boudreau, M.D., D.D.S. – Plaintiffs' Retained Expert Witness

29)   Kent Shoji, M.D.– Plaintiffs' Retained Expert Witness

30)   Stanley F. Malamed, B.S., D.D.S. – Defendant's Retained Expert Witness

31)   Richard Zoraster, M.D. – Defendant's Retained Expert Witness

B.  Defendants' Witnesses

The United States may call or to present testimony of the following witnesses:

1.   Noah Agard, D.D.S.

2.   Karen Olivares

3.   Antonio Sanchez, M.D.

4.   Margarita Alvardo

5.   Nancy Banuelos, R.N.

6.   Stanley Malamed, D.D.S. (Defendant's retained expert)

7.   Richard Zoraster, M.D. (Defendant's retained expert)

8.   Kent T. Shoji, M.D. (Plaintiffs' retained expert)

9.   Richard Boudreau, D.D.S. (Plaintiffs' retained expert)

10.   Uvaldo Valencia

11.   Maria Valencia

VIII.  Exhibits

The following is a list of documents or other exhibits that the parties expect to offer at trial.  NO EXHIBIT, OTHER THAN THOSE LISTED IN THIS SECTION, MAY BE ADMITTED UNLESS THE PARTIES STIPULATE OR UPON A SHOWING THAT THIS

32

ORDER SHOULD BE MODIFIED TO PREVENT "MANIFEST INJUSTICE."  Fed. R. Civ. P. 16(e); Local Rule 16-281(b)(11).

A.  Plaintiffs' Exhibits

Plaintiffs:

The Plaintiffs expect to offer at trial the following documents or other exhibits:

1. True and correct copies of pages numbered 2, 90, 89, 88, 81 of Volume No. 1 of the Deposition of Richard Zoraster, M.D.

2. Root Cause Analysis Report by Henry Cisneros, Vice President of Dental Affairs, Dated July 25, 2003.

3. True and correct copies of pages numbered 1, 49, 50, 53, 54, 51, 124, 125 of Volume No. 1 of the Deposition of Noah Alex Agard, D.D.S.

4. True and correct copies of pages numbered 1, 2, 3, of Family Health Care Dental History, 1999.

5. True and correct copies of pages numbered 31, 2, 3, 4, 3, Dental History for Gracia Valencia, 2003.

6. Declaration of Karen Y. Olivares in Support of Defendant United States of America's Motion for Summary Judgment and for Partial Summary Adjudication.

7. True and correct copies of page REF.: 035143, Emergency Medical Services Prehospital Care Report for Gracia Valencia.

8. True and correct copy of page numbered CHART# 101-92-25 of Family Health Care Dental "Progress Note" for Garcia Valencia

9. True and correct copies of pages numbered 23, 24, 25, 26 of Discharge Summary for Gracia Valencia –5-10-03 from Sierra View Hospital

10. Expert Report and Curriculum Vitae of Kent T. Shoji, M.D. Pursuant to F.R.C.P. Rule 26

11. Expert Report and Curriculum Vitae of Richard Boudreau, D.D.S., Pursuant to

FRCP Rule 26.

12. Expert Report and Curriculum Vitae of Stanley F. Malamed, B.S. D.D.S., Pursuant to FRCP Rule 26.

13. Expert Report and Curriculum Vitae of Richard Zoraster, M.D., Pursuant to FRCP Rule 26.

14. True and correct copies of pages numbered 14, 15, 16, 23, 24, 44, 132, 133, 134 of Volume No. 1 of the Deposition of Kent T. Shoji, M.D.

15. True and correct copies of pages numbered 1, 142, 143, 144, 145, 146, 147,of Volume No. 1 of the Deposition of Richard Boudreau, M.D

16. Declaration of Antonio F. Sanchez, M.D., in Support of Defendant United States of America's Motion for Summary Judgment and for Partial Summary Adjudication.

17. True and correct copy of page number 1 of 04-10-03 Progress Notes for Family HealthCare Network for Gracia Valencia.

18. All documents attached to the deposition of Richard Boudreau, M.D., D.D.S., taken on November 15, 2007.

19. All documents attached to the deposition of Kent T. Shoji, M.D. taken on November 02, 2007.

20. All documents attached to the deposition Stanley F. Malamed, B.S., D.D.S., taken on January 29, 2008.

21. All documents attached to the deposition Richard Zoraster, M.D., taken on November 29, 2007.

22. All documents attached to the deposition Noah Alex Agard, D.D.S., taken on July 14, 2006.

23. All documents attached to the deposition Margarita Alvardo, dated October 03, 2006.

24. All documents attached to the deposition Antonio F. Sanchez, M.D., taken on

1    March 20, 2006.

2    25.    All documents attached to the deposition Christopher Kolker, M.D., taken on

3           October 03, 2006.

4    26.    All documents attached to the deposition of Karen Yvonne Olivares, taken on July

5           13, 2006.

6    27.    All documents attached to the deposition of Henery Cisneros, JR, dated March 22,

7           2006.

8    28.    All documents attached to the deposition of Zinnia Mendez, dated October 03,

9           2006.

10   29.    All documents attached to the Deposition of Guadalupe Quezada, D.D.S., dated

11          March 22, 2006

12   30.    All documents attached to Plaintiffs' Designation of Expert Witnesses Pursuant to

13          F.R.C.P.; Declaration of Kent M. Henderson and Exhibits 1-2 Thereto.

14   31.    All documents attached to Defendant United States of America's Supplemental

15          Expert Witness Disclosures

16   32.    Tulare County Emergency Medical Services Medical Records and Narratives for

17          Decedent, Gracia Valencia, including but not limited to April 10, 2003, Prehospital

18          Care Report.

19   33.    Family Health Care Network – Job Description

20   34.    Family Health Care Network – Policy manual CODE BLUE

21   35.    Family Health Care Network – Clinical Practice Guidelines

22   36.    DHHS – response to litigation report (27 July 2005)

23   37.    Initial Disclosures of Defendant – USA

24   38.    FHCN Medical Records and Narratives for Decedent, Gracia Valencia

25   39.    FHCN Dental Records and Narratives for Decedent, Gracia Valencia

26   40.    Sierra View District Hospital Billing Statements for Gracia Valencia

27

28                                          35

41.     Employment Qualifications for Noah Alex Agard, D.D.S.

42.     Employment Qualifications for Antonio F. Sanchez, M.D.

43.     Sierra View District Hospital, Medical Records and Narratives for Decedent, Gracia Valencia.

B.  Defendants' Exhibits

The United States may offer at trial the following documents or other exhibits:[2]

1.     Agard Deposition Exhibits Nos 3-5, 9, 11, 12, 14

2.     Consent form

3.     Sanchez Deposition Exhibit No. 1

4.     Excerpts of deposition testimony of Dr. Kent T. Shoji, M.D.

5.     Excerpts of deposition testimony of Dr. Richard Boudreau, D.D.S.

6.     Excerpts of deposition testimony of Uvaldo Valencia

7.     Excerpts of deposition testimony of Maria Valencia

8.     Documents relied upon by Dr. Richard Zoraster, M.D.

9.     Documents relied upon by Dr. Stanley Malamed, D.D.S.

10.    Medical licensure documents for Dr. Richard Boudreau, D.D.S.

11.    Albuterol and nebulizer.

12.    Photographs of crash cart.

13.    Diagram, photographs and interactive media of Family Healthcare Network, including floor plan and physical layout of dental clinic, medical clinic, and location of crash cart.

IX.  Discovery Documents To Be Used At Trial (Answers To Interrogatories And Responses To

---

[2]     The United States reserves the right to seek leave of Court to offer additional documents or exhibits at trial, including those which are not presently in the possession of the United States, such as prior deposition or trial testimony of Plaintiffs' retained experts.  The United States also reserves the right to seek leave of Court to use additional documents or exhibits for purposes of refreshing the recollection of witnesses or for impeachment but which will not be offered as exhibits into evidence.

1 | Requests For Admissions)

2 |    Plaintiffs:

3 | Deposition of Kent T. Shoji, M.D., dated November 02, 2007

4 | Deposition of Richard Boudreau, M.D., D.D.S., dated November 15, 2007

5 | Deposition Richard Zoraster, M.D., taken on November 29, 2007

6 | Deposition of Margarita Alvardo, dated October 03, 2006

7 | Deposition of Zinnia Mendez, dated October 03, 2006

8 | Deposition Stanley F. Malamed, B.S., D.D.S., taken on Tuesday, January 29, 2008

9 | Deposition of Noah Alex Agard, D.D.S., dated July 14, 2006

10 | Deposition of Antonio F. Sanchez, M.D., taken on March 20, 2006

11 | Deposition of Henry Cisneros, JR, D.D.S., dated March 22, 2006

12 | Deposition of Christopher Kolker, M.D. dated October 03, 2006

13 | Deposition of Maria Valencia, dated October 04, 2006

14 | Deposition of Uvaldo Valencia, dated October 04, 2006

15 | Deposition of Alicia Lopez, dated October 04, 2006

16 | Deposition of Guadalupe Quezada, D.D.S., dated March 22, 2006

17 | Deposition of Karen Yvonne Olivares, dated July 13, 2006

18 |    United States:

19 | The United States intends to use the following discovery documents:

20 |    Plaintiffs Designation of Expert Witnesses Pursuant to F.R.C.P. 26;

21 | Declaration of Kent M. Henderson and Exhibits 1-2 Thereto, dated April 27, 2007.

22 | X. Further Discovery or Motions

23 |   Plaintiffs will bring a motion to present the testimony of Doctor Boudreau by videotape.

24 | The United States will oppose this request.

25 | XI. Stipulations

26 | The United States has agreed with Plaintiffs as to the following stipulation:

27 |

28 |

1       a.     Documents produced by the United States from Family HealthCare Clinic are

2  considered authenticated under Fed.R.Evid. 901.  The parties reserve the right to object for lack of

3  foundation to the contents of the documents.

4  <u>XII.  Amendments/Dismissals</u>

5       None.

6  <u>XIII.  Settlement Negotiations</u>

7       The parties have engaged in a settlement conference before the Honorable Gary S. Austin.

8  The matter did not resolve.

9  <u>XIV.  Agreed Statement</u>

10       Plaintiffs do not anticipate the use of agreed statements at this time.

11  <u>XV.  Separate Trial Of Issues</u>

12       The parties believe that bifurcation is not feasible or advisable because there are discreet

13  issues with respect to liability and damages that can best be tried at the same time.

14  <u>XVI.  Impartial Experts - Limitation Of Experts</u>

15       The parties do not believe that the appointment of an impartial expert is warranted.  Both

16  sides have designated two retained experts each.

17  <u>XVII.  Attorneys' Fees</u>

18       Attorneys fees are not sought by or available to Plaintiffs.  Pursuant to 28 U.S.C. § 2678,

19  Plaintiffs payment of attorneys fees is limited to twenty-five percent (25%) of any recovery from

20  judgment.

21  <u>XVIII.  Further Trial Preparation</u>

22       <u>A.  Final Witness List</u>

23       The parties are ordered to file and serve their final list of witnesses by Thursday,

24  October 15, 2009.  Additionally, at that time Plaintiffs shall disclose the order of witnesses so that

25  Defendants will be prepared for cross-examination.

26       Except upon the showing set forth above in section VII, a party may not add

27

28                                  38

witnesses to the final list of witnesses, or to any other updated witness list, who are not disclosed in this Order in Section VII.

B.  Trial Briefs

The parties are directed to file and serve a Trial Brief by Friday, September 25, 2009.  Local Rule 16-285.  The parties need not include in the Trial Brief any issue that is adequately addressed in a motion in limine, or in an opposition brief to a motion in limine.  Any response to a Trial Brief shall be filed and served by October 5, 2009.

C.  Duty of Counsel to Pre-Mark Exhibits

The parties are ordered to confer no later than September 17, 2009, for purposes of pre-marking and examining each other's exhibits.  All joint exhibits must be pre-marked with numbers preceded by the designation JT/-- (e.g., JT/1, JT/2).  All of Plaintiffs' exhibits shall be pre-marked with numbers.  All of Defendants' exhibits shall be pre-marked with letters.

1.  Counsel shall create four (4) complete, legible sets of exhibits in binders as follows:

(a)  Two sets of binders to be delivered to Courtroom Clerk, Harold Nazaroff, not later than Thursday, October 15, 2009; one for use by the Courtroom Clerk and the other for the court; and

(b)  One set for each counsel's own use.

If the parties desire, they may have a fifth set of binders to be used for the purposes of questioning witnesses.

2.  Counsel are to confer and make the following determination with respect to each proposed exhibit to be introduced into evidence, and to prepare separate indexes - one listing joint exhibits, and one listing each party's separate exhibits:

(a)  Duplicate exhibits, i.e., documents which both sides desire to introduce into evidence, shall be marked as a joint exhibit, and numbered as directed above.  Joint exhibits shall be listed on a separate index, and shall be admitted into evidence on the motion of any party, without further foundation.

(b)  As to exhibits that are not jointly offered, and to which there is no objection to introduction, those exhibits will likewise be appropriately marked, e.g., Plaintiffs' Exhibit 1 or Defendants' Exhibit A, and shall  be listed in the offering party's index in a column entitled "Admitted In Evidence."  Such exhibits will be admitted upon introduction and motion of the party, without further foundation.

(c)  Those exhibits to which the only objection is a lack of foundation shall be marked appropriately, e.g., Plaintiffs' Exhibit 2 - For Identification, or Defendants' Exhibit B - For Identification, and indexed in a column entitled "Objection Foundation."

(d) Remaining exhibits as to which there are objections to admissibility not solely based on a lack of foundation shall likewise be marked appropriately, e.g., Plaintiffs' Exhibit 3 - For Identification or Defendants' Exhibit C - For Identification, and indexed in a third column entitled "Other Objection" on the offering party's index.

3.  Each separate index shall consist of the exhibit number or letter, a brief description of the exhibit, and the three columns outlined above, as demonstrated in the example below:

INDEX OF EXHIBITS

| EXHIBIT # | DESCRIPTION | ADMITTED IN EVIDENCE | OBJECTION FOUNDATION | OTHER OBJECTION |
| --- | --- | --- | --- | --- |

Two sets of the completed joint index and the separate indexes shall be delivered to the Courtroom Clerk with the two sets of binders.

The court has no objection to counsel using copies.  However, the copies must be legible.  If any document is offered into evidence that is partially illegible, the court may sua sponte exclude it from evidence.

D.  Discovery Documents

By Thursday, October 15, 2009, each party shall file a list of all discovery documents the party intends to use at trial.  The list shall indicate whether each discovery document has previously been lodged with the Clerk.  If the discovery document has not been

previously lodged, the party shall so lodge the document with the Courtroom Clerk by Thursday, October 15, 2009.

### E.  Motions In Limine Hearing and Briefing Schedule

The hearing for motions in limine will be held on Wednesday, September 30, 2009, at 10:00 a.m. in courtroom 2.  In addition to addressing any filed motions in limine, at that time the court will also settle, to the extent possible, any other matter pertaining to the conduct of the trial.

Counsel are expected to be fully cognizant of the legal issues involved in the case by the date of the hearing for motions in limine.

By 4:00 p.m. on September 17, 2009, all motions in limine, with supporting points and authorities, shall be filed and served either personally or by facsimile upon opposing counsel.

By 4:00 p.m. on September 25, 2009, opposition to any motion in limine shall be filed and served either personally or by facsimile upon opposing counsel.  If a party does not oppose a motion in limine, that party shall file and serve in the same manner a Statement of Non-Opposition to that motion in limine.

### F.  Morning Conferences During Trial

During the trial, it is the obligation of counsel to meet with the court each morning to advise the court and opposing counsel as to what documents are proposed to be put into evidence that have not previously been admitted by stipulation, court order, or otherwise ruled upon.  The court will rule on those documents, to the extent possible, prior to the commencement of trial each day out of the presence of the jury.  If the ruling depends upon the receipt of testimony, the court will rule as requested upon the receipt of such testimony.

The court shall consider any other legal matter at morning conferences as well. The court does not wish to recess the trial to hear legal argument outside of the presence of the jury, and proper preparation by counsel will eliminate the need for that result.

G.  Order Of Witnesses

In order to make the trial operate efficiently and smoothly, each counsel has the continuing obligation to advise opposing counsel as to what witnesses he or she intends to call at each trial session.

H.  Use Of Videotapes

Any party wishing to use a videotape for any purpose during trial shall lodge a copy of the videotape with the Courtroom Clerk on Thursday, October 15, 2009.  If a written transcript of audible words on the tape is available, the court requests that the transcript be lodged with the court, solely for the aid of the court.

I.  Use of Videotapes

If counsel intends to use a laptop computer for presentation of evidence, they shall contact the courtroom deputy clerk at least one week prior to trial.  The courtroom deputy clerk will then arrange a time for counsel to bring the laptop to the courtroom, and meet with a representative of the Information and Technology Department and receive a brief training session on how counsel's equipment interacts with the court's audio/visual equipment.  If counsel intends to use PowerPoint, the resolution should be set no higher than 1024 x 768 when preparing the presentation.

XIX.  Objections to Pretrial Order

Any party may, within ten (10) calendar days after the date of service of this order, file and serve written objections to any of the provisions of this order.  Local Rule 16-283.  Such objection shall specify the requested corrections, additions or deletions.

XX.  Rules of Conduct During Trial

A.  General Rules

1.  All participants in the trial shall conduct themselves in a civil manner.  There shall be no hostile interchanges between any of the participants.

2.  All oral presentations shall be made from the podium, unless otherwise

1  permitted by the court.

2      3.  Sidebar conferences are discouraged.  Legal arguments or discussion of issues

3  outside the presence of the jury should be done during recesses.

4      4.  Counsel shall advise their respective clients and witnesses not to discuss any

5  aspect of the case in the common areas of the courthouse accessible to the jurors, such as

6  the lobby, the elevators, the hallways and the cafeteria.

7  circumstances, the court may allow brief direct questioning by counsel.

8      D.  Case in Chief

9      1.  Counsel shall have his/her witnesses readily available to testify so that there are

10  no delays in the presentation of evidence to the trier of fact.

11      2.  At the close of each trial day, counsel shall disclose his/her anticipated witnesses

12  and order of presentation for the next day, so that any scheduling or evidentiary issues may

13  be raised at that time.

14      E.  Witnesses

15      1.  Before approaching a witness, counsel shall secure leave of court to approach

16  the witness.

17      2.  Before approaching a witness with a writing, counsel shall first show the writing

18  to opposing counsel.

19      F.  Exhibits

20      1.  All exhibits shall be marked and identified in accordance with the instructions in

21  the Pretrial Order.

22      2.  An exhibit shall not be published to the jury until it has been admitted into

23  evidence and counsel has secured leave of court to publish the exhibit.

24      3.  The court usually will conduct an on the record review of the exhibits that have

25  been admitted in evidence at the conclusion of each party's case in chief and after each

26  party has rested its entire case.

27

28                                           43

G.  Objections

1.  No speaking objections or arguments are permitted in the presence of the jury. Counsel shall state the specific legal ground(s) for the objection, and the court will rule based upon the ground(s) stated.  The court will permit counsel to argue the matter at the next recess.

2.  The court will not assume that any objection made also implies with it a motion to strike an answer that has been given.  Therefore, counsel who has made an objection, and who also wishes to have an answer stricken, shall also specifically move to strike the answer.

H.  Closing Argument

1.  Counsel may use visual aids in presenting the closing argument.  However, any proposed visual aids shall be shown to opposing counsel before closing argument.

FAILURE TO COMPLY WITH ALL PROVISIONS OF THIS ORDER MAY BE GROUNDS FOR THE IMPOSITION OF SANCTIONS, INCLUDING POSSIBLE DISMISSAL OF THIS ACTION OR ENTRY OF DEFAULT, ON ANY AND ALL COUNSEL AS WELL AS ON ANY PARTY WHO CAUSES NON-COMPLIANCE WITH THIS ORDER.

IT IS SO ORDERED.

**Dated:    September 10, 2009**               /s/ **Anthony W. Ishii**
                                        CHIEF UNITED STATES DISTRICT JUDGE